# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Housing Enterprise Ins. Co.,

                Plaintiff,        Case No. 18-14022

v.                                Judith E. Levy
                                United States District Judge

Hope Park Homes Ltd. Dividend
Housing Assoc. Ltd. Partnership,   Mag. Judge R. Steven Whalen
*et al*,

                Defendants.

_____/

## OPINION AND ORDER DISMISSING DEFENDANT AIG SPECIALTY INSURANCE COMPANY FOR LACK OF SUBJECT MATTER JURISDICTION [64], GRANTING IN PART AND DENYING IN PART PLAINTIFF HOUSING ENTERPRISE'S SUMMARY JUDGMENT MOTION [69], AND DENYING DEFENDANT/CROSS-CLAIMANT STARSTONE'S SUMMARY JUDGMENT MOTION [75]

## I.    INTRODUCTION

Plaintiff Housing Enterprise Insurance Company, Inc. brought this action for a declaratory judgment that Plaintiff has "no duty to defend, no duty to indemnify, and no duty to pay" a number of property owners and insurers in connection with an underlying Michigan insurance case.

(ECF No. 59, PageID.680.) In the underlying case, a furnace malfunction resulted in the carbon-monoxide poisoning of the Agee family in the Brightmoor neighborhood of Detroit, Michigan. (ECF No. 1-2, PageID.19.) Plaintiff, a liability insurer of the company that owned the home, has filed this action seeking a declaration that the Agee family's claims are "excluded from coverage under [Plaintiff's] Policy" and that Plaintiff therefore has no duty to "its insureds or any other defendant herein in connection with actual or alleged bodily injury sustained by [the Agee family]." (ECF No. 59, PageID.694.)

Plaintiff filed an amended complaint in this case on May 29, 2019 against eleven defendants. (ECF No. 59.) Plaintiff names as defendants all parties to the underlying litigation, as well as three insurance companies that were not parties to the underlying litigation. (*Id.*) In response to Plaintiff's amended complaint, the parties filed three dispositive motions. Defendant AIG Specialty Insurance Company (Defendant ASIC), which was not a party to the underlying litigation, filed a motion to dismiss for lack of subject matter jurisdiction. (ECF No. 64.) Plaintiff responded to Defendant ASIC's motion to dismiss and subsequently filed a motion for summary judgment as to all parties and

claims. (ECF No. 69.) Finally, Defendant/Cross-Claimant StarStone National Insurance Company (Defendant StarStone), which was also not a party to the underlying litigation, joined Plaintiff's motion for summary judgment and cross-moved for summary judgment in its own right as to all parties and claims. (ECF No. 75.)

For the reasons below, the Court GRANTS Defendant ASIC's motion to dismiss, GRANTS IN PART AND DENIES IN PART Plaintiff's motion for summary judgment, and DENIES Defendant StarStone's motion for summary judgment.

## II.    BACKGROUND

### 1. The parties and relationships

Plaintiff is a commercial general liability insurer that insured two entities relevant to the case here: Defendant Hope Park Homes Limited Dividend Housing Association Limited Partnership (Defendant HPHLP) and non-party Northwest Detroit Neighborhood Development Corporation (Non-party NDNDC). (ECF No. 59, PageID.680.) Defendant HPHLP owned the Underlying Property and was a defendant in the underlying litigation. (*Id.* at PageID.680.)

Defendant Hope Park Homes, Inc. (Defendant HPH) is a general partner of Defendant HPHLP and was a defendant in the underlying litigation. (ECF No. 59, PageID.681-682.)

Defendant KMG Prestige (Defendant KMG) is a property management company and was Defendant HPHLP's property manager for the Underlying Property. (*Id.* at PageID.682.) Defendant KMG was a defendant in the underlying litigation. (*Id.*)

Defendant Motor City Heating & Cooling, Inc. (Defendant Motor City) serviced the furnace at the Underlying Property and was a defendant in the underlying litigation. (*Id.* at PageID.682-683.)

Defendants Tammy Greenlee, Frederick Agee, and minors T.G. and T.A. (the Agee family or the Agee defendants) resided at the Underlying Property in April 2017 and were plaintiffs in the underlying litigation. (*Id.* at PageID.682)

Defendants Affinity Property Management and Brightmoor Homes, Inc. (Defendant APM and Defendant Brightmoor) were defendants in the underlying litigation, though Plaintiff pled that "upon information and belief" APM and Brightmoor were not involved with the Unerlying Property during the relevant time period. (*Id.* at PageID.683.)

Defendant Rockhill Insurance Company (Defendant Rockhill) provided commercial general liability insurance to Defendant KMG during April 2017. (*Id.* at PageID.684.)

Defendant StarStone issued a Following Form Excess Liability Policy to Non-party NDNDC during April 2017. (*Id.*) Defendant StarStone's policy followed, and was in excess of, Plaintiff's policy. (*Id.*) Defendant StarStone filed a cross-claim in response to Plaintiff's complaint, requesting declaratory relief that it has no duty to defend or indemnify any party in the dispute pursuant to its own insurance policy. (ECF No. 28, PageID.310-311.)

Defendant ASIC insured Defendants KMG and HPHLP under a commercial real estate pollution legal liability policy during April 2017. (*Id.* at 683.) Defendant ASIC has moved to dismiss itself from the lawsuit for lack of subject matter jurisdiction. (ECF No. 64.)

## 2. The Underlying Litigation

On or around April 13, 2017, the Agee family's furnace malfunctioned. (ECF No. 1-2, PageID.18.) The malfunction "permitt[ed] the carbon monoxide rich products of combustion to become part of the breathable air inside of the [Underlying Property]." (*Id.* at PageID.18-

19.) The Agee family was poisoned and severely injured as a result of this carbon monoxide leak. (*Id.* at PageID.19.) The Agee family's complaint in the underlying litigation alleged that, after the family was taken to the hospital for their injuries, the energy company had to "disconnect the natural gas to the [Underlying Property] due to a 'hazardous/dangerous' defective heat appliance vent." (*Id.*) Because the mechanics of the poisoning are essential to resolving questions in this case, the Court reproduces the Agee family's description here:

> 40. Carbon monoxide is a molecule that had been present in the atmosphere contained within the [Underlying Property] at varying levels for an undetermined period of time []
>
> 41. As carbon monoxide is colorless, odorless and tasteless, the atmosphere of an enclosed space can be toxic, and even fatal, to unwary humans when its ratio of carbon monoxide molecules to breathable and inert air molecules becomes too high and that toxic level remains undetected or diluted back down to a non-toxic level through adequate or appropriate ventilation.
>
> 42. Beginning on April 13, 2017, the ratio of carbon monoxide molecules to breathable or inert molecules reached such a level in the atmosphere contained within the premises of the [Underlying Property] that the atmosphere became toxic to human beings, to include [the Agee family].
>
> 43. The toxic or fatal ratio of carbon monoxide molecules to the inert and breathable molecules in the atmosphere contained within the premises of the [Underlying Property]

remained undetected and inadequately ventilated into the [Underlying Property], where [the Agee family was] residing.

(*Id.* at PageID.19-20.)

The Agee family sued various defendants for negligence, arguing that the defendants had not properly equipped the Underlying Property with functioning carbon monoxide detectors and that the Underlying Property did not have adequate ventilation to protect occupants from this harm. (*Id.* at PageID.20-21.) The Agee family alleged that, "[a]s a direct and proximate result of the carbon monoxide poisoning, [we] are now permanently disabled, unable to function normally, progress in [our] cognitive or psychological function, maturity and socialization, work at [our] full capacity or earn a living in the future." (*Id.* at PageID.21.)

During their investigation of the events leading up to the poisoning, several parties to this and the underlying case retained experts to examine the Agee family's furnace. (*See, e.g.*, ECF No. 72-3.) Defendants Agee and KMG retained Dr. Christopher John Damm, a mechanical engineer and professor at the Milwaukee School of Engineering. (*Id.* at PageID.1050.) Along with experts retained by Defendants HPH and Motor City, Dr. Damm inspected the Agee family's furnace on three separate occasions: May 10, 2017, September 13, 2018, and November 7,

2018. (*Id.* at PageID.1050-1051.) On each occasion, the experts noted that the Agee family's furnace exhibited a "manifold pressure [that] was significantly higher than normal for the natural gas application for this type of furnace." (*Id.* at PageID.1050.) Indeed, "[u]ltimately, all of the experts, defense, plaintiff, and non-party, agreed with this condition and pressure measurement and that this high fuel pressure was the cause of the high levels of carbon monoxide in the exhaust flue gas." (*Id.*)

Dr. Damm produced an affidavit discussing the furnace's high pressure. After extensive examination, Dr. Damm concluded that "the cause of the production of carbon monoxide that poisoned the [Agee family] was a malfunction of the internal regulating system of the Honeywell valve in the subject furnace, preventing manually regulated control of the combustion process, which caused that furnace combustion process, including the fire at the furnace burners to be fuel rich." (*Id.* at PageID.1051.) Because the mechanics of the malfunction are essential to resolving questions in this case, the Court reproduces Dr. Damm's description here:

> [T]he principal purpose of the Honeywell fuel valve is, in fact, to regulate the manifold pressure, controlling the amount of fuel to be supplied to the furnace combustion process, including the fire at the furnace burners.

At the suggestion of the engineering expert for Honeywell, the adjustment screw cap on the gas valve was removed, the furnace was restarted, and the manifold and inlet pressures were measured. It was undisputed by any of the parties' experts that the removal of the adjustment screw cap resulted in stabilization of the outlet manifold pressure permitting the fuel valve adjustment screw to again be used to manually adjust the amount of fuel being supplied to the combustion process . . . however, the furnace is not intended to be operated and should not be operated in a residence with the adjustment screw cap removed.

The gas regulator's adjustment screw cap has a hollow center intended to allow free flow of air so as to obtain an atmospheric baseline for regulating gas pressure. Ultimately, it was determined that an obstruction to, or reduction in, the area of the main vent passage through the valve adjustment screw cap was not allowing the diaphragm to adjust to atmospheric pressure, preventing proper and necessary gas pressure regulation to the combustion process which resulted in elevated gas pressure, incomplete combustion and elevated CO production in the exhaust flue gas. Attempts to correct this condition by manually adjusting the fuel valve adjustment screw, and then installing the adjustment screw cap, failed during this inspection . . .

If the vent in the adjustment screw cap is obstructed or otherwise disrupting the free flow of air to the valve's diaphragm, as was the condition found in this furnace's fuel valve, the diaphragm for the regulator does not have access to the atmospheric reference pressure, and the combustion process cannot be controlled by the manual adjustment screw. To put it simply, yet scientifically accurately, the combustion process in this furnace was rendered an uncontrollable fire due exclusively to the malfunctioning Honeywell fuel valve. This resulting uncontrollable fire at the furnace burners produced excessive carbon monoxide in the exhaust gas,

which mixed with the ambient air in the subject residence on the day of the incident . . . [u]ntil the adjustment screw cap was permanently removed from the gas valve in the laboratory, no matter what adjustments we made to the fuel valve adjustment screw, we could not reproduce a static safe fuel supply to the furnace combustion process, to include the fire at the burners in the subject furnace. It was this inability of the fuel valve to control that fuel flow that rendered the combustion process, to include the fire at the furnace burners, uncontrolled and uncontrollable while in operation on the day of the *Agee* incident, resulting in the production of the carbon monoxide the fire department measured in the breathable air of the subject residence on the day of the carbon monoxide poisoning incident.

(*Id.* at PageID.1050-1053.)

At the time of the Agee family's injuries, Defendant HPHLP owned the property at issue with Defendant HPH as a general partner, and Defendant KMG was the property manager. (ECF No. 59, PageID.680-82.) Defendants HPHLP, HPH, and KMG were insured under policies issued by both Plaintiff and Defendant ASIC. Plaintiff provided commercial general liability insurance (HEIC Policy) to Non-Party NDNDC as the first named insured and to Defendants HPHLP, HPH, and KMG as additional insureds. (*Id.* at PageID.680.) Defendant ASIC provided a commercial real estate pollution legal liability policy (ASIC Policy) to Defendant KMG as the named insured, and to Defendant HPHLP as additional insured. Under the terms of their respective

policies, both Plaintiff and Defendant ASIC contributed to the defense of Defendants HPHLP, HPH, and KMG during the underlying litigation. (*Id.* at PageID.686.) The underlying litigation ultimately resolved through settlement of $7 million to the Agee family. (*Id.* at PageID.688-689.)

### 3. Plaintiff's Insurance Policy

In 2016, Plaintiff issued a commercial liability insurance policy (Plaintiff's Policy) to Non-party NDND, with Defendants HPHLP and KMG covered as additional insured. (ECF No. 1-3, PageID.64, 149, 168.) Plaintiff's Policy, HEICL-224552-166827-2016, was effective December 31, 2016 to December 31, 2017. (*Id.* at PageID.64.) It provided general liability insurance and covered Underlying Plaintiffs' home in the underlying litigation. (*Id.* at PageID.130.)

Plaintiff's Policy provided, in relevant part:

We pay all sums which an insured becomes legally obligated to pay as damages due to bodily injury . . . to which this insurance applies. The bodily injury . . . must be caused by an occurrence which takes place in the coverage territory, and . . . must occur during the policy period.

(*Id.* at PageID.151.) The Policy defines "bodily injury" as "bodily harm, sickness, or disease sustained by a person." (*Id.* at PageID.148.) An

"occurrence" is "an accident[, including] repeated exposure to a similar condition." (*Id.* at PageID.149.)

Plaintiff's Policy contains the following exclusion to coverage ("the Pollution Exclusion"):

> We do not pay for a loss if one or more of the following excluded events apply to the loss, regardless of other causes or events that contribute to or aggravate the loss, whether such causes or events act to produce the loss before, at the same time as, or after the excluded event.
>
> . . .
>
> 10. We do not pay for:
>
>> a. bodily injury or property damage arising out of the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of pollutants:
>>
>>> 1) at or from any premises, site, or location which is, or was at any time, owned by, occupied by, rented to, or loaned to any insured, unless the bodily injury or property damage arises from the heat, smoke, or fumes of a fire which becomes uncontrollable or breaks out from where it was intended to be located.

(*Id.* at PageID.153-155.) Finally, Plaintiff's Policy defines "pollutants" in relevant part as:

> [A]ny solid, liquid, gaseous, thermal, or radioactive irritant or contaminant, including acids, alkalis, chemicals, fumes, smoke, soot, vapor, and waste. Waste includes materials to be disposed of as well as recycled, reclaimed, or reconditioned.

(*Id.* at PageID.155.)

### 4. Defendant/Cross-Claimant StarStone's Insurance Policy

Defendant StarStone issued a following-form excess liability insurance policy, No. 76506Q161ALI, to Non-party NDND that was valid from December 31, 2016 to December 31, 2017 (the StarStone Policy). (ECF No. 76, PageID.1229.) The StarStone Policy "follows" Plaintiff's policy, providing additional coverage for "damages covered by the Followed Policy," and "[copying] the definitions, terms, conditions, limitations and exclusions" of Plaintiff's policy "[e]xcept as otherwise provided." (*Id.* at PageID.1231.)

Defendant StarStone's policy contains its own pollution exclusion, which excludes coverage for any damage "[a]rising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time; or arising out of pollution cost or expense." (*Id.* at PageID.1236.)

Defendant StarStone's policy also includes a nullification clause for its pollution exclusion, providing that:

> However, if insurance for bodily injury or property damage for such discharge, dispersal, seepage, migration, release or

escape of pollutants, or pollution cost or expense, is provided by the Underlying Policies:

1. This exclusion shall not apply; and

2. The insurance provided by this Policy will not be broader than the insurance coverage provided by the Underlying Policies.

(*Id.* at PageID.1236.)

Finally, Defendant StarStone's policy notes that Defendant StarStone "will not be required to assume charge of the investigation of any claim or defense of any suit against an Insured." (*Id.* at PageID.1233.)

## 5. Relationship Between Plaintiff and Defendant ASIC

Though Defendant ASIC seems to have settled its claims with the other parties to Plaintiff's suit, Plaintiff is concerned that Defendant ASIC has not settled with Plaintiff. According to Plaintiff's amended complaint, Defendant ASIC's payment of $2 million to Underlying Plaintiffs "eroded [ASIC's] policy limits," thereby ending Defendant ASIC's duties and obligations to Underlying Plaintiffs and Defendants HPH, HPHLP, and Brightmoor in the underlying litigation. (ECF No. 59, PageID.686.) Defendants ASIC and KMG also stipulated in a separate lawsuit that Defendant ASIC had no further payment or defense

obligations to Defendant KMG stemming from the April 2017 incident. *See AIG Specialty Insurance Co. v. KMG Prestige, Inc.*, No. 2:18-cv-13803 (E.D. Mich. March 27, 2019); (ECF No. 59, PageID.687.)

On March 8, 2019, Plaintiff requested that Defendant ASIC stipulate that "[ASIC] will not make any claim against [Plaintiff] and will not argue or advocate . . . that [Plaintiff] has or had any duty to defend, any duty to indemnify, or any other duty to make any payment to anyone . . . in connection with or arising out of the Underlying Litigation [or] the [ASIC] policy." (ECF Nos. 57-5; 59, PageID.688.) Plaintiff alleges that, to date, "[ASIC] has not agreed that it will not pursue a claim or action against [Plaintiff] and that Defendant ASIC has "made no representation or assertion that [ASIC] does not have a claim against [Plaintiff], or that it will not bring any claim or action against [Plaintiff] in connection with the Underlying Action [in the future]." (ECF No. 59, PageID.690.)

## 6. **LAW AND ANALYSIS**

The Court now turns to the three dispositive motions. For the reasons below, the Court GRANTS Defendant ASIC's motion to dismiss for lack of subject matter jurisdiction, GRANTS IN PART AND DENIES

IN PART Plaintiff's summary judgment motion, and DENIES Defendant/Cross-Claimant StarStone's motion for summary judgment.

## 1. Defendant ASIC's Motion to Dismiss

Defendant ASIC filed a motion to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). (ECF No. 64.) Specifically, Defendant ASIC facially attacks subject-matter jurisdiction by arguing that Plaintiff "fails to allege any facts, legal theory or other basis" that would create a "true and current controversy between [Plaintiff] and ASIC" within the meaning of Article III. (*Id.* at PageID.751.) For the reasons below, Defendant ASIC's motion to dismiss is GRANTED.

In a facial challenge to subject matter jurisdiction, courts must accept "the material allegations of the petition as true and construed in the light most favorable to the nonmoving party." *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). In this case, Plaintiff seeks a general declaration that Plaintiff has no duty to indemnify anyone— including Defendant ASIC—in connection with the underlying carbon monoxide claims based on Plaintiff's pollution exclusion policy. (ECF No. 1.)

In its motion to dismiss, Defendant ASIC argues that there is no case or controversy between itself and Plaintiff because Plaintiff has not alleged any existing dispute, injury, or threat of future dispute or injury, and because Defendant ASIC is not a necessary party to Plaintiff's suit for declaratory judgment. (ECF No. 64, PageID.753.) Defendant ASIC argues that the Court can grant Plaintiff "complete relief by making a determination of whether [Plaintiff]'s pollution exclusion bars coverage as to all of the claims actually asserted by the defendants that have pursued coverage under that policy." (ECF No. 68, PageID.818.) Ultimately, Defendant ASIC argues that it should be dismissed from this lawsuit because it is not a party to Plaintiff's policy, it has not asserted a claim under the policy, it has not issued a policy in excess to Plaintiff's policy, and it has not filed a lawsuit seeking relief with regard to any "future, hypothetical claim" against Plaintiff. (*Id.*)

In response, Plaintiff argues that Defendant ASIC "has not agreed that it will not make a claim against [Plaintiff], thereby leaving [Plaintiff] at risk of separate or later litigation inconsistent with general concepts of joinder of claims and judicial economy, potentially leading to inconsistent outcomes, and contrary to the purpose of the Declaratory

Judgment Act." (ECF No. 67, PageID.794.) Plaintiff additionally argues that it "has a right to have all of its legal obligations arising out [of] these underlying carbon monoxide bodily injury claims and the underlying litigation resolved as against all involved parties in one forum . . . to avoid piecemeal litigation." (*Id.* at PageID.690.) Finally, Plaintiff argues that its claim against Defendant ASIC is definite and concrete for two reasons: first, because Defendant ASIC previously filed and settled a declaratory judgment action with Defendant KMG relating to the same carbon monoxide claims and resolving Defendant ASIC's obligations to Defendant KMG; and second, because the Agee family has received a "$7 million consent judgment against defendants KMG and Affinity." (*Id.* at PageID.792-793, 799-800.)

Because Plaintiff cannot establish a live case or controversy between itself and Defendant ASIC, Plaintiff does not have the requisite Article III standing to establish subject-matter jurisdiction over this defendant. Standing has three elements: 1) there occurred an injury in fact, or "an invasion of legally protected interests which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; 2) the injury must be "fairly traceable to the challenged

action of the defendant"; and 3) "it must be likely that the injury will be redressed by a favorable decision." *Fednav, Ltd. v. Chester*, 547 F.3d 607, 614 (6th Cir. 2008) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

Plaintiff requests declaratory relief. The Declaratory Judgment Act allows parties to seek judgment prior to a "completed injury-in-fact," but relief is still "limited to the resolution of an 'actual controversy.'" *Nat'l Rifle Ass'n of America v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997); U.S.C. § 2201(a) ("[I]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration."). Courts have routinely interpreted the Act's reference to cases of "actual controversy" to mean "actual controversy in a constitutional sense." *Nat'l Rifle Ass'n of America*, 132 F.3d at 279 (citing *Aetna Life Ins. Co.*, 300 U.S. at 239-40) (internal quotations omitted). The Sixth Circuit has held that a plaintiff can show an actual controversy for declaratory purposes in one of two ways: first, through "any indirect or implicit or covert charge [of infringement] or threat [of suit or] . . . any conduct or course of action from which any charge or threat could be inferred." *Robin Products Co.*

*v. Tomecek*, 465 F.2s 1193, 1195 (6th Cir. 1972). Alternatively, a plaintiff may demonstrate that "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Hemlock Semiconductor Corp. v. Kyocera Corp.*, 747 Fed. Appx. 285, 292 (6th Cir. 2018).

District courts in the Sixth Circuit have persuasively held that, "particularly in cases involving insurance coverage, declaratory judgment actions to determine the scope of liability are permissible." *TIG Ins. Co. v. Merryland Childcare & Dev. Ctr., Inc.*, No. 04-2666, 2005 WL 3008646, at *2 (W.D. Tenn. Nov. 9, 2005). However, courts may not grant declaratory judgment when liability itself is so speculative that determining scope becomes premature. *See id.* ("[T]he disagreement must not be nebulous or contingent but must have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them.") In short, "[w]here it appears that the contingent event upon which the controversy rests is unlikely to occur,

the controversy lacks sufficient immediacy and reality to warrant declaratory relief." *Id.* (internal citations omitted).

There is no current controversy between Plaintiff and Defendant ASIC, and any future controversy is speculative. Plaintiff's alleged injury is that Defendant ASIC "has not agreed that it will not pursue a claim or action against [Plaintiff] in connection with or arising out of [ASIC's] $2 million in defense and settlement payments" from the underlying litigation. (ECF No. 59, PageID.690.) In other words, Plaintiff is concerned that Defendant ASIC will file a claim against it at some point in the future. The basis of Plaintiff's concern about future claims is that Defendant ASIC did not settle with Underlying Plaintiffs on behalf of all its insureds. Instead, Plaintiff alleges that Defendant ASIC agreed "to settle [the Agee family]'s claims against only defendants HPH, HPHLP, and Brightmoor, while not settling or paying anything on behalf of its named insured defendant KMG." (ECF No. 59, PageID.686.) However, Plaintiff acknowledges that Defendant ASIC agreed to a stipulated order declaring that "ASIC no longer has a duty to continue providing a defense to KMG in the underlying lawsuit." (*Id.*) Thus, even according to

Plaintiff's own account, Defendant ASIC no longer has an obligation to Defendant KMG.

Further, even if Defendant ASIC had an ongoing obligation to pay Underlying Plaintiffs on behalf of Defendant KMG, Defendant ASIC is not an appropriate party to this declaratory judgment action, because any future dispute regarding Defendant ASIC's liability to Defendant KMG would be between those parties alone. The relationship between Plaintiff and Defendant ASIC is that they both insured Defendants HPHLP and KMG. (*See* ECF No. 59, PageID.683.) However, Plaintiff does not allege that Defendant ASIC has ever pursued coverage under Plaintiff's Policy. Plaintiff does not allege that Defendant ASIC seeks, or has ever sought, reimbursement for its own coverage. Plaintiff does not allege that Defendant ASIC's policy reinsures or is excess to Plaintiff's policy. To the contrary, Plaintiff acknowledges that "[t]he HEIC pollution exclusion now at issue was not at issue in the now-dismissed Underlying Litigation, or in the now-dismissed A[SIC]-KMG action." (ECF No. 67, PageID.808.)

It is true that Defendant ASIC may one day seek to recoup its $2 million settlement from Plaintiff through some legal theory—Plaintiff

suggests "reimbursement" or "contribution" or "subrogation." (ECF No. 67, PageID.801). However, Plaintiff has given the Court no reason to believe that it could reasonably infer a threat of suit from Defendant ASIC's conduct, or that any such suit has "sufficient immediacy and reality to warrant declaratory relief." *Robin Products Co.*, 465 F.2d at 1195; *TIG Ins. Co.*, 2005 WL 3008646, at *2. As Defendant ASIC correctly points out, if Plaintiff "can, at most, guess what ASIC's hypothetical claim(s) might be, there simply is no current case or controversy" between the parties. (ECF No. 68, PageID.815.) "While it may be desirable to have all parties tangentially related to a case joined therein, such joinder is not justified when it allows the court to engage in resolution of hypothetical abstract questions." *Allstate Ins. Co v. Wayne County*, 760 F.2d 689, 697 (6th Cir. 1985) (internal citations omitted).

Plaintiff cannot bring Defendant ASIC's claims for them. For the reasons stated, the motion to dismiss is GRANTED.

## 2. Plaintiff's Summary Judgment Motion

Plaintiff moves for summary judgment pursuant to Federal Rules of Civil Procedure 56 and 57 on all claims and counterclaims and against all defendants. (ECF No. 69, PageID.820.) Plaintiff argues that it has no

duty to defend, indemnify, or pay any defendant in connection with any injuries sustained in the underlying litigation because Plaintiff's insurance policy excluded claims for pollutants, gaseous irritants, and contaminants. (*Id.*) Because the Agee Family was injured by carbon monoxide gas poisoning, Plaintiff argues that its pollution exclusion policy immunizes it from all liability stemming from the underlying litigation. (*Id.* at PageID.833.)

Defendants Agee, Affinity, KMG, Rockhill, and StarStone responded to Plaintiff's summary judgment motion.[1] Defendants Agee, KMG, and Affinity (the Agee Defendants) filed a joint response arguing that the pollution exclusion does not apply to the underlying incident

---

[1] Two of the responses merit only brief discussion here. Defendant Rockhill responded to note that its own insurance policy contains a similar pollution exclusion "which will be the subject of a separate motion." (ECF No. 74, PageID.1163.) Defendant Rockhill also notes that "HEIC brings no direct claim against Rockhill," and argues that the Court should either dismiss Defendant Rockhill or enter an order that is without prejudice to "any motion Rockhill may bring" in a motion that will be "separately addressed." (*Id.*) Defendant Rockhill is free to bring its own dispositive motion, but at this time the Court declines to dismiss it absent a formal motion.

Additionally, Defendant/Cross-Claimant StarStone also responded to and joined Plaintiff's summary judgment motion. (ECF No. 75.) However, Defendant StarStone's response was primarily a joinder and cross-motion for summary judgment on its own behalf. (*Id.* at PageID.1166.) Because Defendant StarStone's pleading was less a response and more its own independent motion, the Court will address Defendant StarStone's filing in the next section.

and, even if it did, the "uncontrollable fire" exception to the pollution exclusion would render Plaintiff liable. (ECF No. 72, PageID.1025.) Specifically, the Agee Defendants argue that there is a material fact question about whether carbon monoxide is a "pollutant" because, unlike toxic man-made chemical compounds, carbon monoxide "is present in smaller concentrations in the earth's atmosphere" and the poisoning here resulted from the carbon monoxide *concentration*—not its mere presence—in the Agee family's home. (*Id.* at PageID.1031-32.) Additionally, the Agee Defendants argue that there is "no case law applying Michigan law that has previously addressed carbon monoxide as a pollutant." (*Id.* at PageID.1030.) Finally, the Agee Defendants argue that the exception to Plaintiff's pollution exclusion applies in this case, because the carbon monoxide resulted from "heat, smoke, or fumes of a fire which [became] uncontrollable." (*Id.* at PageID.1035.)[2] (*Id.* at PageID.1012.)

---

[2] The Agee Defendants also "question[] the prematurity" of this summary judgment motion. (ECF No. 72, PageID.1012.) Specifically, they note that "[t]here has been no discovery in this matter." (*Id.* at PageID.1041.) However, contrary to the requirements of Federal Rule of Civil Procedure 56, the Agee Defendants do not tell the Court what additional discovery they require. Fed. R. Civ. P. 56(d) (requiring that "a nonmovant show[] by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition"). Though the Sixth Circuit has held

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). While it is Plaintiff's burden to identify those portions of the pleadings "which it believes demonstrate the absence of a genuine issue of material fact," the burden then shifts to Defendants to "set forth specific facts showing that there is a genuine issue for trial," even "go[ing] beyond the pleadings" if necessary. *Pearce v. Faurecia Exhaust Sys.*, 529 Fed. Appx. 454, 457 (6th Cir. 2013) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)). The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc.*

---

that a party need not formally file a Rule 56(d) affidavit requesting additional discovery in order to postpone a summary judgment ruling, the moving party must still "clearly explain[] its need for more discovery on a particular topic." *Moore v. Shelby County*, 718 Fed. Appx. 315, 319 (6th Cir. 2017). Absent any argument from the Agee Defendants that they require more discovery on a particular topic, absent a request for any specific relief from the Court, and given that the Court finds that the Agee Defendants prevail as a matter of law, the Court declines to provide relief under Rule 56(d).

*v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.,* 305 F.3d 520, 526 (6th Cir. 2002)).

Because this Court is sitting in diversity, Michigan state substantive law applies to the issues in this case. *Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001). Michigan law requires that courts interpret insurance policies as contracts. *Wilkie v. Auto-Owners Ins. Co.*, 469 Mich. 41, 47 (2003). Insurance contract interpretation is a question of law and courts must "give [the policy] its ordinary and plain meaning if such would be apparent to a reader of the instrument." *Id.* Ambiguous provisions and exclusionary clauses are both construed "against the insurer and in favor of coverage." *Id.*

In this case, Plaintiff has demonstrated that carbon monoxide is a "pollutant" within the meaning of Plaintiff's Policy, and the pollution exclusion therefore applies. However, Defendants have created a question of material fact as to whether the "uncontrollable fire" exception applies to Plaintiff's pollution exclusion. For the reasons below, Plaintiff's motion for summary judgment is therefore GRANTED IN PART and DENIED IN PART.

## A. Carbon monoxide is a "pollutant" under the HEIC Policy

Plaintiff's Policy defines a "pollutant" as any "solid, liquid, gaseous, thermal, or radioactive irritant or contaminant, including acids, alkalis, chemicals, fumes, smoke, soot, vapor, and waste." (ECF No. 1-3, PageID.155.) The Agee family's complaint described the carbon monoxide poisoning as the result of "carbon monoxide rich products of combustion" creating a dangerously high "ratio of carbon monoxide molecules to breathable and inert air molecules," ultimately requiring the energy company to "disconnect the natural gas." (ECF No. 1-2, PageID.18-19.)

There is no dispute that the description above is an accurate summary of the way in which the Agee family was poisoned. On these facts, and with a plain-language understanding of the pollution exclusion terms, it is clear as a matter of law that the carbon monoxide poisoning constituted a gas that was either an irritant, a contaminant, a chemical, or a fume. Merriam-Webster dictionary defines a "contaminant" as "something that contaminates," and the definition of "contaminate" is "to make unfit for use by the introduction of unwholesome or undesirable

elements."[3] *Contaminate*, Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/contaminate (Feb. 18, 2020). The same dictionary defines a "fume" as "an often noxious suspension of particles in a gas (such as air)." *Fume*, Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/fume (Feb. 18, 2020). The State of Michigan Department of Health & Human Services refers to carbon monoxide as a "deadly fume." *See, e.g.*, *Carbon Monoxide Poisoning*, State of Michigan Dept. of Health & Human Servs., https://www.michigan.gov/mdhhs/0,5885,7-339-71548_54783_54784_54787---,00.html, (Feb. 24, 2020). It is undisputed in this case that the concentration of carbon monoxide in Underlying Plaintiffs' home was noxious and rendered the air unfit for use by the introduction of unwholesome or undesirable elements—here, the carbon monoxide itself. As a matter of law, carbon monoxide therefore falls within the "pollution exclusion" in Plaintiff's Policy.

The Agee Defendants argue that there is a genuine question of material fact about whether carbon monoxide is a "pollutant" under the

---

[3] Michigan courts routinely use dictionaries to help determine the plain meaning of terms in an insurance contract. *See, e.g.*, *Rory v. Continental Ins. Co.*, 473 Mich. 457, 476 (2005).

HEIC policy for two reasons. First, the Agee Defendants argue that "[t]here is no case law applying Michigan law that has previously addressed carbon monoxide as a pollutant." (ECF No. 72, PageID.1030.) Second, they argue that carbon monoxide is distinguishable from typical airborne pollutants because "it is [a] naturally occurring chemical present in everyday life," and it is a "stretch to use these definitions to encompass a naturally occurring chemical component of the earth's atmosphere." (*Id.* at PageID.1031.) For the reasons below, neither of these arguments is compelling.

The Agee Defendants' first argument is unavailing because, regardless of whether Michigan courts have categorized carbon monoxide as a pollutant under previous pollution exclusions, there is no doubt that carbon monoxide was a pollutant within the meaning of *this* pollution exclusion. Michigan courts evaluate each insurance policy as its own contract "in accordance with its [own] terms" and will not permit comparative rewriting "under the guise of interpretation." *See McKusick v. Travelers Indem. Co.*, 246 Mich. App. 329, 338 (Mich. Ct. App. 2001). For this same reason, the Agee Defendants' arguments about "historical"

interpretations of separate pollution exclusions are similarly unsuccessful.

The Agee Defendants' second argument fares no better. There is no language in the pollution exclusion requiring that a pollutant be man-made, and Michigan law would not permit the Court to "engraft" such a requirement. *Id.* Additionally, though Michigan courts have not yet specifically held that carbon monoxide is a "pollutant" for the purposes of a pollution exclusion, they have long held that naturally-occurring chemicals may become "contaminates" in certain quantities. *McGuirk Sand & Gravel, Inc. v. Meridian Mut. Ins. Co.*, 220 Mich. App 347, 356-57 (Mich. Ct. App. 1996) (holding that petroleum—a naturally-occurring liquid found beneath the earth's surface—had so "contaminated" the water that it constituted a "pollutant"). Finally, it is not a "stretch" of Michigan precedent to categorize carbon monoxide as a pollutant within the meaning of this Policy because Michigan's own Department of Health & Human Services refers to carbon monoxide as a "deadly fume." *See, e.g.*, *Carbon Monoxide Poisoning*, State of Michigan Dept. of Health & Human Servs., https://www.michigan.gov/mdhhs/0,5885,7-339-71548_54783_54784_54787---,00.html, (Feb. 24, 2020).

## B. The carbon-monoxide discharged, dispersed, seeped, migrated, released, or escaped from Underlying Plaintiffs' stove

Plaintiff's pollution exclusion applies to bodily damage that "aris[es] out of the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of pollutants." (ECF No. 1-3, PageID.155.) As the Agee Defendants' expert Dr. Christopher John Damm explained after his examination of the furnace, the carbon monoxide entered the Agee family's environment as part of the furnace's "exhaust gas, which mixed with the ambient air."

On these facts, and under a plain-language understanding of the terms in Plaintiff's Policy, it is clear that the carbon monoxide either discharged, dispersed, seeped, migrated, escaped, or was released into Underlying Plaintiffs' air. Merriam-Webster dictionary defines "seep" as "to become diffused or spread." *Seep*, Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/seep (Feb. 24, 2020). The same dictionary defines "disperse" as "to spread or distribute from a fixed or constant source." *Disperse*, Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/disperse (Feb. 24, 2020). Both of these definitions accurately describe the process of a gas

exiting a furnace's exhaust pipe and mixing into the breathable air of a room.

The Agee Defendants cite two cases for the proposition that "there [i]s no discharge of pollutants where the people [a]re injured at their own premises," (ECF No. 72, PageID.1040-1041), but such analysis once again ignores the unambiguously broad terms of this particular insurance policy as applied to the facts of this particular case. *See, e.g.*, *McKusick*, 246 Mich. App. at 338 ("In this case, the pollution exclusion endorsement unambiguously provided that no coverage would be afforded for damage claims resulting from the discharge, dispersal, seepage, migration, release, or escape of pollutants . . . [t]here are no exceptions to the exclusion and no limitations regarding its scope, including the location or other characteristics of the discharge . . . [t]his Court must enforce the insurance policy in accordance with its terms as interpreted in light of their commonly used, ordinary, and plain meanings."). The Court will not impose an external limitation on the Policy's terms when the terms are clear as written. The carbon monoxide poisoning clearly falls within Plaintiff's pollution exclusion.

## C. The "uncontrollable fire" exception

Although Plaintiff's pollution exclusion bars coverage for injuries due to pollution, this exclusion has an exception of its own. Plaintiff's Policy provides coverage for pollution injuries in two instances: 1) if the injury arose "from the heat, smoke, or fumes of a fire" which became "uncontrollable"[4]; or 2) if the injury arose "from the heat, smoke, or fumes of a fire" which "br[oke] out from where it was intended to be located." (ECF No. 1-3, PageID.155.) Because Defendants have raised a material question of fact as to whether the bodily injury arose from the heat, smoke, or fumes of an uncontrollable fire, the Court DENIES summary judgment to Plaintiff on this issue.[5]

Though the Agee family's complaint did not describe the way in which their furnace malfunctioned, the Agee Defendants attached an affidavit from Dr. Damm discussing the engineers' findings. (ECF No. 72-3.) Dr. Damm described the malfunction as the result of an obstructed

---

[4] Merriam-Webster dictionary defines "uncontrollable" as "incapable of being controlled." *Uncontrollable*, Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/uncontrollable (Feb. 25, 2020).

[5] Defendants do not argue that the second exception—pollution due to a fire that broke out from "where it was intended to be located"—applies here. Because the Court finds that the uncontrollable fire exception applies, there is no need to reach the question of whether this second exception also applies.

adjustment screw cap that "prevent[ed] proper and necessary gas pressure regulation to the combustion process[,] which resulted in elevated gas pressure, incomplete combustion, and elevated [carbon monoxide] production in the exhaust flue gas." (*Id.* at PageID.1050.) Dr. Damm noted that the engineers' "[a]ttempts to correct this condition by manually adjusting the fuel valve adjustment screw . . . failed during this inspection." (*Id.* at PageID.1051.) While the engineers were eventually able to control the fuel supply by completely removing the adjustment screw cap, Dr. Damm noted that "[t]he removal of the [] screw cap was performed in the laboratory to confirm our hypothesis that the combustion process could not have been controlled on the day of the incident" and that "the furnace is not intended to be operated and should not be operated in a residence with the adjustment screw cap removed." (*Id.* at PageID.1052.)

Dr. Damm summarized his findings as follows: "To put it simply, yet scientifically accurately, the combustion process in this furnace was rendered an uncontrollable fire due exclusively to the malfunctioning Honeywell fuel valve. This resulting uncontrollable fire at the furnace burners produced excessive carbon monoxide in the exhaust gas, which

mixed with the ambient air in the subject residence on the day of the incident." (*Id.*)

The findings in Dr. Damm's affidavit are sufficient to create a material fact about whether the Agee family's bodily injuries arose from the fumes of a fire which became uncontrollable. Dr. Damm's affidavit directly alleges that the carbon monoxide was the result of fumes produced by excessive fire combustion, and that due to the broken adjustment screw cap, the Agee family was unable to control the fire's combustion on the day in question. *Id.* at PageID.1053.)

Plaintiff did not address the uncontrollable fire exception in its summary judgment motion, and Plaintiff's reply did not attempt to discredit or substantively dispute Dr. Damm's affidavit. Instead, Plaintiff merely asserted, with no evidence, that,

> [T]he fire []here did not fall under the 'uncontrollable' prong of the exception to the pollution exclusion because the flame was capable of being turned off . . . [t]he furnace at [the Agee family's] home could have been properly maintained with the fuel volume controlled by the installed valve or could have been turned off.

(ECF No. 77, PageID.1262.) However, this unsubstantiated assertion directly contradicts Dr. Damm's testimony that the engineers could not

manually operate the screw cap—"no matter what adjustments [they] made"—until they physically removed the cap in the laboratory. (ECF No. 72-3, PageID.1052-1053 (noting that removing the screw cap is not how the furnace is "intended to be operated," nor how it "should [] be operated").)

While it appears possible that the Agee family could have controlled the fire by removing the screw cap, the Agee Defendants have raised a strong inference that the defective cap rendered the fire and fumes uncontrollable, making the carbon monoxide pollution the result of an "uncontrollable fire" within the meaning of Plaintiff's uncontrollable fire exception. Accordingly, Defendants have carried their burden in "go[ing] beyond the pleadings" and "set[ting] forth specific facts showing that there is a genuine issue for trial." *Pearce*, 529 Fed. Appx. at 457. Summary judgment is therefore DENIED to Plaintiff on this claim.

### 3. Defendant StarStone's joinder, cross-claim, and summary judgment motion

Defendant/Cross-Claimant StarStone responded to and joined Plaintiff's summary judgment motion. (ECF No. 75.) Defendant StarStone also cross-moved for summary judgment on its own behalf "in relation to StarStone's cross-claim and all other claims, cross-claims or

counterclaims pending before the Court." (*Id.* at PageID.1166.) Specifically, StarStone argues that its own policy follows-form to Plaintiff's pollution exclusion and that a finding that Plaintiff's pollution exclusion bars Plaintiff's liability would also obviate Defendant StarStone's liability. (*Id.*) Additionally, Defendant StarStone argues that its policy contains a distinct pollution exclusion "which separately bars any potential excess coverage for claims asserted in the Underlying Litigation." (*Id.*) Finally, Defendant StarStone argues that it would not be required to defend in any event because the StarStone policy does not include a contractual obligation to defend. (*Id.* at PageID.1179.)

Defendants Agee, KMG, and Affinity filed a joint response to Defendant StarStone's cross-motion. (ECF No. 79.) The Agee Defendants reincorporate their responses to Plaintiff's summary judgment motion.[6] (*Id.* at PageID.1278-1279.)

---

[6] The Agee Defendants also argue that Defendant StarStone's response violates the Eastern District of Michigan's Electronic Filing Policies and Procedures' prohibition on combining motion responses with counter-motions. (ECF No. 79, PageID.1277); E.D.M.I. E.F.P. 5(f). However, the Court agrees with Defendant StarStone that its "response" was more appropriately styled as a joinder and that the true substance of the filing was the independent cross-motion for summary judgment. *See infra n.1.* To strike Defendant StarStone's motion under these circumstances— particularly after the Agee Defendants substantively replied to it—would needlessly elevate the form of Rule 5(f) over its function, and the Court declines to do so here.

For the reasons below, summary judgment is DENIED to Defendant StarStone on all grounds.

## A. Defendant StarStone's Follow-Form and Pollution Exclusion Policy

Defendant StarStone's Policy "followed" Plaintiff's policy, meaning that it copied the "definitions, terms, conditions, limitations and exclusions" of Plaintiff's policy "[e]xcept as otherwise provided." (ECF No. 76, PageID.1231.) Though the StarStone Policy contained its own independent pollution exclusion, Defendant StarStone concedes that its pollution exclusion does not apply if "[pollution] coverage is first provided by a followed policy, in this case [Plaintiff's] Policy, at the primary level." (ECF No. 75, PageID.1181; ECF No. 76, PageID.1236.) Because Defendant StarStone's followed policy—Plaintiff's Policy—may cover the pollution in this case for the reasons discussed previously, Defendant StarStone's own pollution exclusion does not apply. Summary judgment is DENIED to Defendant StarStone on this ground.

---

*See, e.g.*, *Strehlke v. Grosse Pointe Public Schools System*, No. 14-11183, 2014 WL 4603482, at *4 n.12 (E.D. Mich. Sep. 15, 2014) (noting that a party's filing violated E.D.M.I. E.F.P. 5(f) but declining to strike it).

## B. Defendant StarStone's Defense Policy

Defendant StarStone's defense policy reads: "[StarStone] will not be required to assume charge of the investigation of any claim or defense of any suit against an Insured." (ECF No. 76, PageID.1233.) Defendant StarStone interprets this language to "expressly state[] that StarStone 'will not be required to assume' the defense of any suit against an Insured." (ECF No. 75, PageID.1179.) However, the Court disagrees that this interpretation of the contract is clear as a matter of law. Accordingly, summary judgment is DENIED to Defendant StarStone on this ground.

An insurer's "duty to defend [an insured] arises solely from the language of the insurance contract." *Stockdale v. Jamison*, 416 Mich. 217, 224 (1982). Plaintiff's Policy, which Defendant StarStone follows, creates an explicit duty to defend: the insurers have "the right and duty to defend a suit seeking damages which may be covered under [the Policy]," and according to the Policy, the word "suit" "includes any alternative dispute resolution proceeding involving bodily injury." (ECF No. 1-3, PageID.153.) Thus, Defendant StarStone is obligated to defend unless its own policy contains language directing otherwise. (ECF No. 75, PageID.1231) (noting that the StarStone Policy follows Plaintiff's Policy

"[e]xcept as otherwise provided").) Though Defendant StarStone has a policy regarding defense of an insured, the policy as written does not clearly exempt Defendant StarStone from defense. (*See* ECF No. 76, PageID.1233 ("[StarStone] will not be required to assume charge of the investigation of any claim or defense of any suit against an Insured.")) In actuality, the policy admits of at least three possible interpretations:

1. StarStone will not be required to assume *charge* of the investigation of any claim and will not be required to assume *charge* of the defense of an Insured;
2. StarStone will not be required to assume charge of the *investigation* of any claim and StarStone will not be required to assume charge of the *investigation* of any defense of an Insured; and
3. StarStone will not be required to assume charge of any investigation and StarStone will not be required to defend any suit against an Insured.

Defendant StarStone would like the Court to adopt the third interpretation, which is the only interpretation that absolutely exempts Defendant StarStone from defending an insured. (*Id.* at PageID.1179.) Both of the other interpretations merely exempt Defendant StarStone from taking "charge" of a defense, which would be a reasonable policy for an insurer that merely follows another insurer's defense obligations. Indeed, all three of these interpretations are reasonable, rendering Defendant StarStone's defense policy ambiguous and unclear. *Petovello*

*v. Murray*, 139 Mich. App. 639, 642 (1984) ("It is a fundamental principle of law that, if the language of a written contract is subject to two or more reasonable interpretations or is inconsistent on its face, the contract is ambiguous, and a factual development is necessary to determine the intent of the parties.") Michigan courts construe ambiguous insurer provisions "against the insurer and in favor of coverage." *Wilkie*, 469 Mich. at 47; *McGuirk Sand & Gravel, Inc*, 220 Mich. App. at 353. In this case, construing Defendant StarStone's contract in favor of coverage would render Defendant StarStone liable for defending the insured in some capacity.

Defendant StarStone provides no reason to prefer its interpretation of the Policy over any other, and the Court may not supply one for it. Accordingly, Defendant StarStone's Policy does not exempt it from defense as a matter of law. Summary judgment is DENIED to Defendant StarStone on this ground.

## 7. CONCLUSION

For the reasons set forth above, the Court GRANTS Defendant ASIC's motion to dismiss; GRANTS IN PART AND DENIES IN PART

Plaintiff's motion for summary judgment; and DENIES Defendant/Cross-

Claimant StarStone's cross-motion for summary judgment.

IT IS SO ORDERED.

Dated: March 17, 2020           s/Judith E. Levy
Ann Arbor, Michigan         JUDITH E. LEVY
                                United States District Judge

CERTIFICATE OF SERVICE

    I hereby certify that a copy of the foregoing document was served upon counsel of record and/or pro se parties on this date, March 17, 2020, using the Electronic Court Filing system and/or first-class U.S. mail.

                              s/William Barkholz
                              Case Manager